**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ANGEL HICKS, SAHIL INC., and | ) | JURY TRIAL DEMANDED |
| CHOICE HOTELS INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, JANE DOE ("Doe"), by and through her undersigned attorneys, for her Complaint against Defendants, ANGEL HICKS ("Hicks"), SAHIL INC. ("Sahil"), and CHOICE HOTELS INTERNATIONAL, INC. ("Choice Hotels"), states as follows:

## PARTIES

1. Plaintiff Doe is a resident of California.

2. Defendant Hicks is a resident of Connecticut.

3. Defendant Sahil is a Massachusetts corporation with its principal place of business at 1080 Riverdale Avenue, West Springfield, Massachusetts 01089.

4. Defendant Choice Hotels is a Delaware corporation with its principal place of business at 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

6. This Court has personal jurisdiction over Hicks because she is a resident of Connecticut.

7. This Court has personal jurisdiction over Sahil and Choice Hotels because they both have continuous and systematic contacts with this judicial district.

8. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Doe's claims occurred in this judicial district.

## FACTS

9. Doe, an 83-year-old grandmother, lives with her youngest son and his family in California.

10. On June 3, 2014, Doe flew from California to Connecticut to visit her husband at a long-term care facility, where he was receiving treatment for late-stage Alzheimer's disease. Doe's husband passed away in September 2014.

11. Doe intended to return to California on June 7, 2014.

12. Doe stayed in a guest room at the long-term care facility on the night of June 3, 2014.

13. Doe had planned to stay in a guest room at the long-term care facility throughout her visit, but, due to a misunderstanding, the facility did not reserve a guest room for Doe for the nights of June 4 and June 5, 2014.

14. Doe had always stayed in a guest room at the long-term care facility when she had visited her husband there in the past.

15.     On June 4, 2014, Doe checked into the Quality Inn at 5 Ella Grasso Turnpike, Windsor Locks, Connecticut 06096 (the "Quality Inn"), trusting that the Quality Inn would provide her a safe place to rest between visits with her husband.

16.     At all relevant times, Sahil owned and operated the Quality Inn as a franchisee of Choice Hotels.

17.     Sahil had previously operated a Ramada Inn at the same location, but Ramada Worldwide, Inc. ("Ramada") revoked the franchise in 2013 because Sahil had failed to maintain the condition of the property in accordance with Ramada's requirements.

18.     Doe's room was on the first floor of the Quality Inn, a two-story motel with approximately 175 rooms.

19.     Doe stayed at the Quality Inn on the night of June 4, 2014.

20.     At approximately 9:00 p.m. on June 5, 2014, Doe entered The Fan Club Sports Bar & Grill (the "Fan Club"), an establishment located within the Quality Inn.

21.     Once she entered the Fan Club, Doe sat at the bar and ordered a glass of wine from the bartender, Jessica Dimeo ("Dimeo").

22.     At approximately 9:30 p.m., Jeffrey LaPorto ("LaPorto"), a 43-year-old man who was not a guest of the Quality Inn, entered the Fan Club, sat next to a female patron, and struck up a conversation with her.

23.     Doe moved to an adjacent seat and joined in their conversation.

24.     At approximately 10:15 p.m., the other female patron left the conversation and moved to a different seat at the bar.

25.     Doe and LaPorto continued to converse, primarily regarding Doe's grandchildren and LaPorto's experience serving as a Navy Seal during Operation Desert Storm and as a trooper in the Connecticut State Police.

26.     Unbeknownst to Doe, the Connecticut State Police terminated LaPorto in December 2010, after four internal affairs investigations against him, including three based on allegations of sexual misconduct toward women.

27.     During her conversation with LaPorto, Doe drank two or three glasses of wine. Doe felt intoxicated from the wine.

28.     At approximately 11:45 p.m., Doe told LaPorto she felt tired and wished to return to her room.

29.     LaPorto offered to escort Doe to her room, and Doe, believing LaPorto to be acting chivalrously, agreed.

30.     When Doe stood up from her barstool, she could not find the keycard for her room.

31.     Doe, with LaPorto at her side, exited the Fan Club and approached the front desk of the Quality Inn.  Doe asked the desk clerk, Hicks, to make her a new keycard.

32.     On information and belief, Hicks was the only employee of the Quality Inn on duty on the night of June 5, 2014 and the early morning of June 6, 2014.

33.     Hicks made a new keycard for Doe's room and handed it to LaPorto.

34.     At that point, Doe and LaPorto walked together away from the front desk and toward Doe's room.

35.     At approximately 12:00 a.m. on June 6, 2014, Dimeo told Hicks she was concerned LaPorto posed a threat to Doe because Doe was intoxicated and had only just met

LaPorto at the Fan Club and because Dimeo suspected LaPorto intended to harm Doe. Dimeo entreated Hicks to find Doe and check on her safety.

36. Hicks undertook to do so. When Hicks did not find Doe on the first floor of the Quality Inn, where her room was located, Hicks searched for Doe on the second floor.

37. At approximately 12:10 a.m., Hicks found Doe, who was obviously intoxicated, wandering in a confused state on the second floor. LaPorto was following closely behind her.

38. Hicks asked Doe what she was doing, and Doe responded that she was looking for her room.

39. Despite the concern Dimeo had expressed to her, Hicks led Doe and LaPorto to Doe's room on the first floor. LaPorto then inserted the keycard, forced Doe into the room, squeezed in behind her, slammed the door closed, and locked it with the deadbolt.

40. Hicks listened at the door for a moment, but, having heard no loud noises during that brief period, she returned to the front desk and took no further action.

41. Inside the room, LaPorto ordered Doe to remove her clothes. Terrified, Doe complied with LaPorto's demand.

42. LaPorto then threw Doe on the bed, pinned her down by her shoulders in a supine position, and forcibly raped her.

43. Doe screamed loudly while LaPorto raped her.

44. Doe attempted to push LaPorto off her, but LaPorto overpowered her.

45. After several minutes, LaPorto threw Doe onto the floor.

46. When Doe was on the floor, she glimpsed LaPorto standing over her and saw a harness strapped around his waist and thighs.

47.     Although Doe did not see a gun, she was afraid LaPorto had one holstered behind his back in the harness.

48.     At that point, LaPorto flipped Doe face-down and continued to rape her.

49.     While Doe was face-down on the floor, LaPorto sodomized her with a foreign object that felt cold, hard, and metallic.  That caused Doe terrible pain, and she screamed even more loudly than she had before.

50.     At approximately 1:45 a.m., after Doe had endured LaPorto's violent sexual assault for nearly 90 minutes, he stood up, dressed, and walked toward the door.  LaPorto pointed his finger at Doe and warned her not to tell anyone what he had done because he was an "important person" and he knew "a lot of important people."  LaPorto then left the room.

51.     Shortly before 2:00 a.m., Doe telephoned her second-youngest son and told him she had been raped.

52.     Because Doe was distraught, Doe's son immediately telephoned the Windsor Locks Police Department (the "Police Department") on her behalf.

53.     After Doe's son telephoned the Police Department, he telephoned the Quality Inn and spoke to Hicks, informing her that Doe had been raped and asking her to assist the police officers after they arrived.

54.     Hicks told Doe's son she had been afraid LaPorto would rape Doe because LaPorto had been acting "sketchy."  Hicks gave Doe's son LaPorto's name and said she had seen LaPorto outside the Quality Inn, walking past the front door to his car, at approximately 1:45 a.m.  As Hicks stated in her sworn statement to police officers, she also told Doe's son that she "felt bad about what happened."

6

55.    Hicks knew LaPorto's name because when Dimeo left the Quality Inn at the end of her shift, at approximately 1:15 a.m., she had given Hicks a piece of paper, on which Dimeo had written LaPorto's full name, and his credit card receipt from the Fan Club.

56.    As Dimeo stated in her sworn statement to police officers, she gave Hicks the piece of paper and credit card receipt because she "had a bad feeling about [LaPorto]," and she wanted to make sure Hicks could provide his name to the police if he were to harm Doe.

57.    While Hicks was speaking with Doe's son, she searched for LaPorto on Facebook and recognized his face in photographs on his profile page.

58.    When police officers arrived at the Quality Inn shortly after 2:00 a.m., they obtained LaPorto's name and photograph from Hicks, and Hicks directed them to Doe's room.

59.    When police officers entered Doe's room, she was wearing only her underwear and appeared "dazed and confused."

60.    The police officers immediately called for paramedics.

61.    Doe dressed and told the police officers she had been raped.

62.    After the paramedics arrived, they transported Doe by ambulance to Saint Francis Hospital and Medical Center in Hartford, Connecticut ("St. Francis") for a medical evaluation and rape screening.

63.    At St. Francis, Jenny Cannon, R.N. ("Cannon") performed a rape screening on Doe.

64.    Cannon found bruising on Doe's left shoulder and extensive tears, bruising, and areas of tenderness on her vagina and anus.

65.    Cannon also completed a rape kit and toxicology kit and ordered laboratory tests for numerous sexually transmitted infections.

66. Based on her experience as a sexual assault nursing specialist, Cannon concluded that Doe's injuries to her vagina and anus were not consistent with consensual sex and that the bruising on Doe's shoulder was consistent with someone's having held her down against her will.

67. John P. Fojtik, M.D. ("Dr. Fojtik") also examined Doe at St. Francis.

68. Dr. Fojtik ordered that Doe be given a Hepatitis B vaccination, three antibiotic medications to treat potential bacterial infections, and two analgesic medications for her pain.

69. Dr. Fojtik also prescribed topical lidocaine and prescription-strength ibuprofen for Doe's pain, docusate sodium for helping Doe regain normal bowel function after the injury to her rectum, and raltegravir and emtricitabine-tenfovir for counteracting Doe's potential exposure to HIV.

70. At approximately 3:45 p.m., Doe was discharged from St. Francis in the care of her nephew, who lives in New York.

71. Police officers arrested LaPorto at approximately 5:00 p.m. on June 6, 2014, and charged him with two counts of first degree sexual assault and one count of first degree unlawful restraint.

72. On June 6, 2014, police officers obtained DNA samples from LaPorto.

73. A police officer told Doe's son on June 6, 2014, that investigators intended to obtain video footage from security cameras in the common areas of the Quality Inn. A police officer later informed Doe's son that video footage from the Quality Inn's security cameras was unavailable because they were not working.

74. On June 10, 2014, and June 12, 2014, the Police Department submitted to the State of Connecticut Department of Emergency Services and Public Protection, Division of

Scientific Services (the "State Lab") LaPorto's DNA samples and cuttings of bodily fluid stains from Doe's underpants and the bedsheets in Doe's room at the Quality Inn.

75.    On July 10, 2014, the State Lab issued a report on its findings, concluding that LaPorto's DNA was consistent with the DNA collected from one semen stain on Doe's underpants and three semen stains on the bedsheets.

76.    On April 7, 2015, under the terms of a plea agreement, LaPorto entered a *nolo contendere* plea on one count of first degree sexual assault in the State of Connecticut Superior Court for the Hartford Judicial District.

77.    On June 6, 2015, the court entered a guilty verdict against LaPorto and, in accordance with the plea agreement, sentenced him to ten years in prison, suspended after two years, followed by ten years of probation and lifelong placement on the Connecticut violent sexual offenders' registry.

78.    At the sentencing hearing, LaPorto's criminal defense attorney informed the court he had advised his client to accept the plea agreement because the State of Connecticut's case against LaPorto would be indefensible if Doe were to testify.

79.    Doe suffered, and continues to suffer, devastating physical and emotional injuries as a result of the rape.

80.    On June 11 and 19, 2014, Doe sought emergency medical treatment for vaginal and rectal bleeding, rectal pain, acute anxiety, and insomnia caused by the rape, as well as agonizing side effects she suffered from the HIV medications.

81.    On June 17, 2014, Doe sought medical treatment for the same symptoms from her gynecologist.

82.    In addition, Doe has received extensive psychological counseling, and she has received ongoing psychiatric treatment.

83.    Doe's psychiatrist has diagnosed her with Post Traumatic Stress Disorder caused by the rape, and he has prescribed her a powerful antipsychotic/anxiolytic medication to help ease the acute anxiety she has experienced since June 6, 2014.

84.    As a result of the rape, Doe lost precious time with her dying husband in his final months, and she has lived under an omnipresent cloud of fear, shame, and agitation, unable to live her life and pursue her interests with the same vigor and enjoyment as she did before.

### COUNT I
### NEGLIGENCE
### AGAINST HICKS

85.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 84 of this Complaint.

86.    Hicks, as the employee of Sahil, an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

87.    At all relevant times, Hicks acted within the scope of her employment by Sahil.

88.    At approximately 12:10 a.m. on June 6, 2014, Hicks knew or should have known the following:  (1) LaPorto had possession of the keycard to Doe's room; (2) Dimeo was concerned LaPorto posed a threat to Doe because Doe was intoxicated and had only just met LaPorto at the Fan Club and because Dimeo suspected LaPorto intended to harm Doe; (3) Doe was so confused that she did not know on which floor of the two-story motel her room was located; (4) Doe was a vulnerable, elderly woman; and (5) LaPorto was a robust, relatively young man.

89.    An ordinary person in Hicks's position, knowing what she knew or should have known, would have anticipated that LaPorto would likely harm Doe if he were to enter Doe's room and remain there undisturbed for a prolonged period.

90.    Hicks breached her duty to protect Doe against unreasonable risk of physical harm in many ways, including, but not limited to, by handing LaPorto the keycard to Doe's room, leading LaPorto to Doe's room, allowing LaPorto to enter the room with Doe, and not checking  on Doe, by telephone or otherwise, after LaPorto entered.

91.    LaPorto would not have raped Doe were it not for Hicks's acts and omissions.

92.    In many ways, including, but not limited to, by handing LaPorto the keycard to Doe's room, leading LaPorto to Doe's room, allowing LaPorto to enter the room with Doe, and not checking on Doe after LaPorto entered, Hicks created or increased the risk that LaPorto would rape Doe.

93.    Doe's rape was within the foreseeable scope of the risk Hicks created through her acts and omissions.  Not only did Dimeo warn Hicks that she suspected LaPorto intended to harm Doe, but also Hicks told Doe's son, during their telephone call at approximately 2:00 a.m. on June 6, 2014, that she foresaw the rape.

94.    Hicks's acts and omissions were a substantial factor in causing Doe's rape.

95.    As a result of Hicks's acts and omissions, Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress.

**COUNT II**
**NEGLIGENCE – VICARIOUS LIABILITY**
**AGAINST SAHIL**

11

96.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 95 of this Complaint.

97.    Sahil, as an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

98.    At all relevant times, Hicks acted within the scope of her employment by Sahil.

99.    Because Hicks acted within the scope of her employment by Sahil, Sahil is responsible for any and all damages caused by Hicks's acts and omissions, as alleged in Count I of this Complaint.

100.   Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Hicks's acts and omissions, as alleged in Count I of this Complaint.

**COUNT III**
**NEGLIGENCE – VICARIOUS LIABILITY**
**AGAINST CHOICE HOTELS**

101.   Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 100 of this Complaint.

102.   As the franchisor of the Quality Inn, Choice Hotels exercised a high degree of control over Sahil's operations with respect to the conduct of its employees, including, but not limited to, Hicks

103.   Specifically, on information and belief, Choice Hotels required the General Manager of the Quality Inn to undergo approximately 30 hours of classroom training and two to four hours of on-the-job training through Choice Hotels's "Hospitality Operations Success Training" program.

12

104. Also, on information and belief, Choice Hotels required all front desk and night audit staff of the Quality Inn, including, but not limited to, Hicks, to undergo approximately 10 to 16 hours of classroom training and 15 to 26 hours of on-the-job training through Choice Hotels's "ChoiceADVANTAGE" training program.

105. In addition, on information and belief, Choice Hotels required all employees of the Quality Inn, including, but not limited to, Hicks, to undergo "Q-Service" training.

106. Choice Hotels advertises to its guests that it mandates "Q-Service" training to ensure that every employee of every Quality Inn is "Professional" and "Responsive."

107. On information and belief, Choice Hotels's "Hospitality Operations Success Training," "ChoiceADVANTAGE" training, and "Q-Service" training programs all include training on how to protect guests against rape and other similar crimes perpetrated by non-guests.

108. Because Choice Hotels exercised a high degree of control over Sahil's operation of the Quality Inn with respect to the conduct of its employees, including, but not limited to, Hicks, Choice Hotels is responsible for any and all damages caused by Hicks's acts and omissions, as alleged in Count I of this Complaint.

109. Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Hicks's acts and omissions, as alleged in Count I of this Complaint.

**COUNT IV**
**NEGLIGENCE – FAILURE TO PROVIDE ADEQUATE TRAINING**
**AGAINST SAHIL**

110. Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 109 of this Complaint.

111.    Sahil, as an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

112.    At the time of the rape, the Quality Inn and budget motels in its immediate vicinity were experiencing a well-publicized epidemic of prostitution and related crimes, including an incident on February 14, 2014, during which police officers arrested 11 people for soliciting prostitution.

113.    The rate at which rapes occurred in the Quality Inn's immediate vicinity in 2014 greatly exceeded the national average.

114.    Based on crime statistics that were available to Sahil in 2014 and based on the violent and sexual crimes that had occurred within the Quality Inn's immediate vicinity during the months preceding Doe's rape, Sahil knew or should have known of the danger of rape and other similar crimes occurring at the Quality Inn.

115.    An ordinary person in Sahil's position, knowing what it knew or should have known, would have anticipated that rape or a similar crime would likely be committed against a guest if Sahil were not to provide adequate training to its employees, including, but not limited to, Hicks, on how to protect guests against rape and other similar crimes on the premises.

116.    Sahil breached its duty to protect Doe against unreasonable risk of physical harm because Sahil failed to provide adequate guest security training to its employees, including, but not limited to, Hicks.

117.    LaPorto would not have raped Doe were it not for Sahil's failure to provide adequate guest security training to its employees, including, but not limited to, Hicks.

118.    By failing to provide adequate guest security training to its employees, including, but not limited to, Hicks, Sahil created or increased the risk that LaPorto would rape Doe.

14

119.    Doe's rape was within the foreseeable scope of the risk Sahil created by failing to provide adequate guest security training to its employees, including, but not limited to, Hicks.

120.    Sahil's failure to provide adequate guest security training to its employees, including, but not limited to, Hicks, was a substantial factor in causing Doe's rape.

121.    Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Sahil's failure to provide adequate guest security training to its employees, including, but not limited to, Hicks.

**COUNT V**
**NEGLIGENCE – FAILURE TO PROVIDE ADEQUATE TRAINING**
**AGAINST CHOICE HOTELS**

122.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 121 of this Complaint.

123.    As the franchisor of the Quality Inn, Choice Hotels exercised a high degree of control over Sahil's operations with respect to the training of its employees, including, but not limited to, Hicks.

124.    Specifically, on information and belief, Choice Hotels required the General Manager of the Quality Inn to undergo approximately 30 hours of classroom training and two to four hours of on-the-job training through Choice Hotels's "Hospitality Operations Success Training" program.

125.    Also, on information and belief, Choice Hotels required all front desk and night audit staff of the Quality Inn, including, but not limited to, Hicks, to undergo approximately 10 to 16 hours of classroom training and 15 to 26 hours of on-the-job training through Choice Hotels's "ChoiceADVANTAGE" training program.

15

126.    In addition, on information and belief, Choice Hotels required all employees of the Quality Inn, including, but not limited to, Hicks, to undergo "Q-Service" training.

127.    Choice Hotels advertises to its guests that it mandates "Q-Service" training to ensure that every employee of every Quality Inn is "Professional" and "Responsive."

128.    On information and belief, Choice Hotels's "Hospitality Operations Success Training," "ChoiceADVANTAGE" training, and "Q-Service" training programs all include training on how to protect guests against rape and other similar crimes perpetrated by non-guests.

129.    Choice Hotels, as an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

130.    Based on crime statistics that were available to Choice Hotels in 2014 and based on the violent and sexual crimes that had occurred within the Quality Inn's immediate vicinity during the months preceding Doe's rape, Choice Hotels knew or should have known of the danger of rape and other similar crimes occurring at the Quality Inn.

131.    An ordinary person in Choice Hotels's position, knowing what it knew or should have known, would have anticipated that rape or a similar crime would likely be committed against a guest if Choice Hotels were not to provide adequate training to Sahil's employees, including, but not limited to, Hicks, on how to protect guests against rape and other similar crimes on the premises.

132.    Choice Hotels breached its duty to protect Doe against unreasonable risk of physical harm because Choice Hotels failed to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks.

16

133.   LaPorto would not have raped Doe were it not for Choice Hotels's failure to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks.

134.   By failing to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks, Choice Hotels created or increased the risk that LaPorto would rape Doe.

135.   Doe's rape was within the foreseeable scope of the risk Choice Hotels created by failing to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks.

136.   Choice Hotels's failure to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks, was a substantial factor in causing Doe's rape.

137.   Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Choice Hotels's failure to provide adequate guest security training to Sahil's employees, including, but not limited to, Hicks.

## COUNT VI
## NEGLIGENCE – FAILURE TO PROVIDE ADEQUATE SECURITY
## AGAINST SAHIL

138.   Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 137 of this Complaint.

139.   Sahil, as an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

140.   Based on crime statistics that were available to Sahil in 2014 and based on the violent and sexual crimes that had occurred within the Quality Inn's immediate vicinity during

17

the months preceding Doe's rape, Sahil knew or should have known of the danger of rape and other similar crimes occurring at the Quality Inn.

141.    An ordinary person in Sahil's position, knowing what it knew or should have known, would have anticipated that rape or a similar crime would likely be committed against a guest if Sahil were not to provide adequate training to its employees, including, but not limited to, Hicks, on how to protect guests against rape and other similar crimes on the premises.

142.    Sahil breached its duty to protect Doe against unreasonable risk of physical harm because Sahil failed to provide adequate security over the premises of the Quality Inn.

143.    Sahil's failed to provide adequate security in many ways, including, but not limited to, by failing to maintain working security cameras in the common areas of the Quality Inn and failing to have any employee, aside from a single desk clerk, monitoring the security of the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014.

144.    LaPorto would not have raped Doe were it not for Sahil's failure to provide adequate security over the premises of the Quality Inn.

145.    By failing to provide adequate security over the premises of the Quality Inn, Sahil created or increased the risk that LaPorto would rape Doe.

146.    Doe's rape was within the foreseeable scope of the risk Sahil created by failing to provide adequate security over the premises of the Quality Inn.

147.    Sahil's failure to provide adequate security over the premises of the Quality Inn was a substantial factor in causing Doe's rape.

148.    Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Sahil's failure to provide adequate security over the premises of the Quality Inn.

**COUNT VII**
**NEGLIGENCE – FAILURE TO PROVIDE ADEQUATE SECURITY**
**AGAINST CHOICE HOTELS**

149.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 148 of this Complaint.

150.    On information and belief, as the franchisor of the Quality Inn, Choice Hotels exercised a high degree of control over Sahil's operations with respect to Sahil's providing security over its premises.

151.    Choice Hotels, as an innkeeper, had a duty to Doe to protect her against unreasonable risk of physical harm.

152.    Based on crime statistics that were available to Choice Hotels in 2014 and based on the violent and sexual crimes that had occurred within the Quality Inn's immediate vicinity during the months preceding Doe's rape, Choice Hotels knew or should have known of the danger of rape and other similar crimes occurring at the Quality Inn.

153.    An ordinary person in Choice Hotels's position, knowing what it knew or should have known, would have anticipated that rape or a similar crime would likely be committed against a guest if Choice Hotels were not to provide adequate training to Sahil's employees, including, but not limited to, Hicks, on how to protect guests against rape and other similar crimes on the premises.

154.    Choice Hotels breached its duty to protect Doe against unreasonable risk of physical harm because Choice Hotels failed to ensure that Sahil provided adequate security over the premises of the Quality Inn.

155.    Choice Hotels failed to ensure that Sahil provided adequate security in many ways, including, but not limited to, by failing to ensure that Sahil maintained working security

cameras in the common areas of the Quality Inn and failing to ensure that Sahil had any employee, aside from a single desk clerk, monitoring the security of the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014.

156.   LaPorto would not have raped Doe were it not for Choice Hotels's failure to ensure that Sahil provided adequate security over the premises of the Quality Inn.

157.   By failing to ensure that Sahil provided adequate security over the premises of the Quality Inn, Choice Hotels created or increased the risk that LaPorto would rape Doe.

158.   Doe's rape was within the foreseeable scope of the risk Choice Hotels created by failing to ensure that Sahil provided adequate security over the premises of the Quality Inn.

159.   Choice Hotels's failure to ensure that Sahil provided adequate security over the premises of the Quality Inn was a substantial factor in causing Doe's rape.

160.   Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Choice Hotels's failure to ensure that Sahil provided adequate security over the premises of the Quality Inn.

## COUNT VIII
## NEGLIGENT HIRING
## AGAINST SAHIL

161.   Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 160 of this Complaint.

162.   According to public records, on October 30, 2008, Hicks was arrested and charged with first degree criminal trespass, felony possession of illegal narcotics, felony sale of illegal narcotics, and felony sale of illegal narcotics within 1,500 feet of a school, public housing project, or day care center.

163.    On February 3, 2009, Hicks pleaded guilty and was convicted of felony possession of illegal narcotics. The court sentenced Hicks to three years in prison, all suspended, and two years of probation.

164.    On August 12, 2009, Hicks was arrested and charged with violating her probation.

165.    On March 25, 2011, Hicks pleaded guilty and was convicted of violating her probation. The court again sentenced Hicks to three years in prison, all suspended, and two years of probation.

166.    At the time Sahil hired Hicks, Hicks's criminal record was publicly available.

167.    Based on Hicks's criminal record, Sahil knew or should have known that Hicks was neither fit nor competent to work as a front desk clerk at the Quality Inn or to be the lone employee responsible for guest security on the night of June 5, 2014 and the early morning of June 6, 2014.

168.    A fit and competent front desk clerk would not have handed LaPorto the keycard to Doe's room, led LaPorto to Doe's room, allowed LaPorto to enter the room with Doe, or failed to check on Doe, by telephone or otherwise, after LaPorto entered.

169.    LaPorto would not have raped Doe were it not for Sahil's hiring Hicks and assigning her to work as the front desk clerk at the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014, when, on information and belief, Hicks was the only employee of the Quality Inn on duty.

170.    By hiring Hicks and assigning her to work as the front desk clerk at the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014, Sahil created or increased the risk that LaPorto would rape Doe.

21

171.    Doe's rape was within the foreseeable scope of the risk Sahil created by hiring Hicks and assigning her to work as the front desk clerk at the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014.

172.    Sahil's hiring Hicks and assigning her to work as the front desk clerk at the Quality Inn on the night of June 5, 2014 and the early morning of June 6, 2014 was a substantial factor in causing Doe's rape.

173.    Doe has suffered damages, including, but not limited to, the cost of obtaining medical treatment, pain and suffering, humiliation, anguish, and severe emotional distress, caused by Sahil's hiring Hicks and assigning her to work as the front desk clerk at the Quality Inn.

## COUNT IX
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST HICKS

174.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 173 of this Complaint.

175.    Hicks's acts and omissions, as alleged in Count I of this Complaint, created an unreasonable risk of causing Doe emotional distress because those acts and omissions created an unreasonable risk that LaPorto would rape Doe.

176.    At the time of Hicks's acts and omissions, it was foreseeable that LaPorto would rape Doe and that Doe would suffer emotional distress as a result of those acts and omissions.

177.    Doe's emotional distress was so severe that it resulted in illness, including, but not limited to, Post-Traumatic Stress Disorder, and bodily harm.

178.    Hicks's acts and omissions caused Doe's emotional distress.

## COUNT X
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

22

**AGAINST SAHIL**

179.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 178 of this Complaint.

180.    Sahil's acts and omissions, as alleged in Counts IV, VI, and VIII of this Complaint, created an unreasonable risk of causing Doe emotional distress because those acts and omissions created an unreasonable risk that a non-guest, such as LaPorto, would rape a guest, such as Doe.

181.    At the time of Sahil's acts and omissions, it was foreseeable that a non-guest, such as LaPorto, would rape a guest, such as Doe, and that the guest would suffer emotional distress as a result of those acts and omissions.

182.    Doe's emotional distress was so severe that it resulted in illness, including, but not limited to, Post-Traumatic Stress Disorder, and bodily harm.

183.    Sahil's acts and omissions caused Doe's emotional distress.

**COUNT XI**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST CHOICE HOTELS**

184.    Plaintiff realleges and incorporates as if fully stated herein the allegations in paragraphs 1 through 183 of this Complaint.

185.    Choice Hotels's acts and omissions, as alleged in Counts V and VII of this Complaint, created an unreasonable risk of causing Doe emotional distress because those acts and omissions created an unreasonable risk that a non-guest, such as LaPorto, would rape a guest, such as Doe.

23

186.    At the time of Choice Hotels's acts and omissions, it was foreseeable that a non-guest, such as LaPorto, would rape a guest, such as Doe, and that the guest would suffer emotional distress as a result of those acts and omissions.

187.    Doe's emotional distress was so severe that it resulted in illness, including, but not limited to, Post-Traumatic Stress Disorder, and bodily harm.

188.    Choice Hotels's acts and omissions caused Doe's emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Doe respectfully requests this Court to enter judgment in her favor and against Defendants and grant her the following relief:

A.  On Count I, an award of compensatory damages in excess of $10,000,000.00;

B.  On Count II, an award of compensatory damages in excess of $10,000,000.00;

C.  On Count III, an award of compensatory damages in excess of $10,000,000.00;

D.  On Count IV, an award of compensatory damages in excess of $10,000,000.00;

E.  On Count V, an award of compensatory damages in excess of $10,000,000.00;

F.  On Count VI, an award of compensatory damages in excess of $10,000,000.00;

G.  On Count VII, an award of compensatory damages in excess of $10,000,000.00;

H.  On Count VIII, an award of compensatory damages in excess of $10,000,000.00;

I.  On Count IX, an award of compensatory damages in excess of $10,000,000.00;

J.  On Count X, an award of compensatory damages in excess of $10,000,000.00;

K.  On Count XI, an award of compensatory damages in excess of $10,000,000.00;

L.  An award of Plaintiff's attorneys' fees and costs incurred in this action;

M.  Pre-judgment and post-judgment interest; and

N.  Such other and further relief as this Court may deem just and proper.

Dated:          July 23, 2015                    Respectfully submitted,

/s/ Lawrence H. Adler
Lawrence H. Adler, Esq. (ct00324)
William B. Wynne (ct00401)
ADLER LAW GROUP, LLC
111 Founders Plaza, Suite 1102
East Hartford, Connecticut 06108
Phone: (860) 282-8686
Fax: (860) 282-8688
ladler@adlerlawgroupllc.com

Edward F. Ruberry, Esq.
Ellen D. Jenkins, Esq.
Alexander R. Hess, Esq.
(Motions for Admission *Pro Hac Vice* pending)
RUBERRY, STALMACK & GARVEY, LLC
500 West Madison, Suite 2300
Chicago, Illinois 60661
Phone: (312) 466-8050
Fax: (312) 488-8055
ed.ruberry@rsg-law.com
ellen.jenkins@rsg-law.com
alex.hess@rsg-law.com

*Attorneys for Plaintiff*

26

## CERTIFICATION

I hereby certify that on July 23, 2015, a copy of the foregoing COMPLAINT was filed electronically. Parties may access this filing through the Court's CM/ECF system.

/s/ Lawrence H. Adler
Lawrence H. Adler, Esq. (ct00324)
William B. Wynne (ct00401)
ADLER LAW GROUP, LLC
111 Founders Plaza, Suite 1102
East Hartford, Connecticut 06108
Phone: (860) 282-8686
Fax: (860) 282-8688
ladler@adlerlawgroupllc.com

*Attorney for Plaintiff*

27